41 N.J. Super. 110 (1956)
124 A.2d 68
HERTZ WASHMOBILE SYSTEM, A CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
THE VILLAGE OF SOUTH ORANGE, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 20, 1956.
*112 Messrs. Stoffer and Jacobs for the plaintiff (Mr. Joseph M. Jacobs appearing).
Messrs. McCarter, English & Studer for the defendant (Messrs. Ward J. Herbert and Donald S. Bowie, Jr., appearing).
WEINTRAUB, J.S.C.
Plaintiff seeks a declaration that a Sunday closing ordinance of defendant is invalid. The ordinance, adopted by a vote of 4 to 2, prohibits the operation of plaintiff's washmobile business along with certain other commercial activities on Sunday, under penalty of fine and imprisonment.
*113 The issues are whether the ordinance (1) is beyond the police power of the municipality; (2) is discriminatory, unreasonable, and oppressive as applied to plaintiff because of an alleged design to drive plaintiff out of business and to deprive plaintiff, by circumvention, of a permit duly issued under the zoning ordinance; (3) is discriminatory in violation of the equal protection clause of the Fourteenth Amendment to the Federal Constitution and of the concept of equality which inheres in Article I, paragraph 1 of the State Constitution, in that the classifications of activities are arbitrary and unreasonable and unrelated to the alleged evil; (4) violates the principle of reasonableness which must attend the exercise of municipal powers; and (5) is beyond municipal power in that it conflicts with the state statute relating to Sunday activities. Some of these questions were recently raised in City of Elizabeth v. Windsor-Fifth Avenue, Inc., 31 N.J. Super. 187 (App. Div. 1954), where, however, most of them were not actually resolved.

I.
When legislation is questioned under the due process provision in its substantive sense the inquiry is twofold: (1) whether the evil is within the reach of the police power, and (2) whether the means selected are reasonably related to the end sought to be achieved. Hence the first step must be to identify the evil. So also the charge of denial of equal protection and unreasonableness cannot be resolved except in the light of the particular evil because the propriety of the classification necessarily depends upon the objective of the legislation.
What is the evil to which Sunday legislation is addressed? Originally the impetus probably had its genesis in religious concepts, and hence we find judicial expressions that our statute sought to prevent desecration of the Sabbath. Reeves v. Butcher, 31 N.J.L. 224, 226 (Sup. Ct. 1865); Fennan v. City of Atlantic City, 88 N.J.L. 435, 437 (Sup. Ct. 1916), affirmed on opinion below, 90 N.J.L. 674-677 *114 (E. & A. 1917). To bottom such legislation upon that ground obviously invites a claim of violation of the constitutional separation of church and state; and hence that basis seems generally to have been abandoned. 50 Am. Jur., Sundays and Holidays, sec. 10, p. 809. The thesis usually advanced today is that the object is to protect all persons from the physical and moral debasement which comes from uninterrupted labor. 50 Am. Jur., Sundays and Holidays, sec. 9, p. 808. Accordingly, other of our decisions state the purpose to be to set aside a day of rest. Sherman v. Mayor and Aldermen of City of Paterson, 82 N.J.L. 345, 346 (Sup. Ct. 1912); Schachter v. Hauenstein, 92 N.J.L. 104, 105 (Sup. Ct. 1918); dissenting opinion in State v. Fair Lawn Service Center, Inc., 20 N.J. 468, 482 (1956); City of Elizabeth v. Windsor-Fifth Avenue, Inc., supra (31 N.J. Super., at page 190). That this objective may be sought under the police power of the State is beyond question, and so also it may not be disputed that the State may choose the Christian Sabbath for the day of rest, as our Legislature has done.
Sunday statutes were not universally supported and it is commonplace that in many areas they become relatively inert. Our state law, as it existed at the time of the 1951 revision of Title 2, imposed half-hearted penalties, ranging from $1 to $20, and the revision deleted even those penalties, State v. Fair Lawn Service Center, Inc., supra (20 N.J., at page 468), all of which, as I see it, reflected a compromise between strongly divergent views, giving satisfaction to the one side and relatively little pain to the other. Recently, interest in the subject has been revived because of considerations foreign to the origin of Sunday laws. With the tremendous increase in automobile travel, mercantile ventures have been established on highways to garner the trade of the Sunday motorist, with a success irritating and menacing to the urban merchant. Thus many who heretofore deprecated Sunday laws as "blue laws" now seek enforcement, not out of piety or preoccupation with the debasement of man consequent upon uninterrupted labor, but rather out *115 of sheer economic concern. Although it is true that Sunday highway operations tend to induce the merchant who otherwise would keep his place closed, to open to meet the competition, and to that extent the opposition may be said to be consonant with assuring a day of rest, yet a large factor is that the city tradesman cannot meet the competition by opening his doors. The purchasers are not there; they prefer to ride and buy. Moreover, in the opinion of one of the Village trustees, the highway operator is not burdened with comparable land costs and local taxes, and because of this and alleged marginal practices can undersell the urban competitor.
Defendant through its counsel disclaims any purpose other than the assurance of a compulsory day of rest, and hence I think it unnecessary to consider whether municipalities are vested with power to adopt Sunday closing ordinances to protect their merchants from competition as such. See N.J. Good Humor, Inc. v. Board of Commissioners of the Borough of Bradley Beach, 124 N.J.L. 162 (E. & A. 1940); cf. Reingold v. Harper, 6 N.J. 182, 192 (1951).
Although one of the trustees placed his vote for the ordinance in part upon his concern with the ravages of highway selling upon the economic well-being of our society, the presence of this motive, if it be conceded to be an improper one, would not invalidate an act of legislation which may be grounded upon an authorized objective. Hence, for the purpose of this case the evil will be deemed to be the debasement of man consequent upon uninterrupted labor.

II.
Is Sunday legislation within the police power delegated to municipalities? It is generally held that the power to provide for the general welfare embraces authority to enact Sunday closing ordinances. 50 Am. Jur., Sundays and Holidays, secs. 6 and 7, pp. 804, 805; 6 McQuillin, Municipal Corporations (3rd ed. 1949), sec. 24.189, p. 768. *116 Hence the authority is included in the grant of power to preserve the welfare made by the Home Rule Act, R.S. 40:48-1. See Sherman v. Mayor and Aldermen of City of Paterson, supra (82 N.J.L. 345); Fennan v. City of Atlantic City, supra (88 N.J.L. 435, affirmed 90 N.J.L. 674-677); Schachter v. Hauenstein, supra (92 N.J.L. 104); Schumacker v. Township of Little Falls, 92 N.J.L. 106 (Sup. Ct. 1918); Mazzarelli v. City of Elizabeth, 164 A. 898, 11 N.J. Misc. 150 (Sup. Ct. 1933); Richman v. Board of Commissioners of the City of Newark, 122 N.J.L. 180 (Sup. Ct. 1939). In City of Elizabeth v. Windsor-Fifth Avenue, Inc., supra (31 N.J. Super., at page 190) it was held that the authority rests as well upon the power to prevent immorality granted by R.S. 40:48-1, par. 6.
The fact that the Legislature has dealt with a subject does not, in this State, necessarily operate to preempt the field. But, of course, the question whether the ordinance exceeds the power granted either because it conflicts with the state statute or is an unreasonable exercise of delegated power, is another matter, considered in IV below.

III.
There are two prongs to plaintiff's charge of denial of equal protection. The first is that the ordinance was designed to single out plaintiff's business for destruction, and the second is that, apart from that inadmissible purpose, the classification of activities is without constitutional warrant. Let us consider the challenges separately.

A.
It is not disputed that the permit for the erection and use of the structure as a washmobile was issued in accordance with the applicable ordinances, including the zoning ordinance. But the property abuts a residential zone. Neighbors *117 were aroused and protested vehemently. They were informed that no ordinance was offended.
The protests followed a number of lines, including claims of depreciation of property value, noise, traffic involvement, and unwarranted use of water which at times had been in short supply.
Defendant successively raised matters upon which plaintiff relies as evidential of a purpose to circumvent the zoning ordinance and by indirection to deprive plaintiff of its right to engage in its business. The Village demanded some arrangement to assure against a worsening of the water problem. Plaintiff agreed, at considerable expense, to install equipment to reuse the water and also to bear part of the cost of water which the Village should have to purchase to meet a shortage. The Village refused connection with its sewer with respect to waste waters resulting from the business operation unless certain materials were eliminated therefrom, and plaintiff agreed to abide by the Village's position. The Village amended its zoning ordinance to control future locations of washmobiles and other operations involving substantial on-site parking. Each of these actions is consistent with good faith, and none bespeaks a pernicious purpose.
There was testimony of a belief that the trustees who voted for the ordinance in fact intended to drive plaintiff out of business, but the opinions thus expressed were merely conclusions drawn by witnesses from the total events, rather than testimony as to an actual expression of that purpose by any of the majority trustees. That testimony accordingly has no inherent probative value; it is merely the opinion of the witnesses upon the very issue which the court must resolve. I cannot refuse to accept the sworn testimony of the majority trustees that such was not their motive.
There is no doubt the washmobile triggered the situation. But for it, an ordinance would not have been adopted. It is true that prior to the washmobile there had been a protest against Sunday business activity, but I agree with the view *118 of one of the majority trustees expressed before and at the trial that if plaintiff had agreed not to operate on Sunday, an ordinance would have been found to be unnecessary. But nonetheless, plaintiff's Sunday operations served the occasion for the crystallization of opposition from all points of view, religious, civic, and, to some extent, economic. Plaintiff's neighbors, unable to be freed of its activities 7 days a week, pressed for at least a Sunday closing, and doubtless much consideration was given to their plea. Additionally, concern was expressed that operators elsewhere who actively seek Sunday commerce might come to the Village and disturb the existing pattern. Accordingly an ordinance was advanced and by successive drafts an arrangement was evolved whereby certain activities would be barred on Sunday.
The trustees determined to permit, with minor exceptions, the continuation of those business activities which had regularly operated on Sunday as revealed by a survey. They prohibited the washing of automobiles, which prohibition encompassed plaintiff's operation and also like operations, not on a mass basis, which theretofore had been conducted by 5 service stations and a garage. There was testimony that the sale of automobiles would have been likewise prohibited but for the enactment of Chapter 254 of the Laws of 1955 which closed those operations statewide. They closed hardware stores, only one of which had regularly opened on Sunday. They prohibited the operations of florists except to permit deliveries on Sunday of cut flowers and floral arrangements if ordered prior thereto. Activities of service stations were further curtailed to the extent of barring the sale of automobile accessories, the lubrication of automobiles, and repairs other than emergency repairs. Otherwise the prohibition appears to extend solely to those operations which in fact had been closed on Sundays.
It is true there had been no protest against the hardware store or the florist shops, or the other proscribed operations (except, of course, the washmobile), beyond some blanket objections to Sunday activities generally. But I cannot *119 find therein a purpose to conceal a design to drive plaintiff from the Village.
The departures thus made by the trustees from what had been the regular practice on Sundays appear rather to represent a compromise resulting from the interplay of the strongly varying views of the trustees who favored an ordinance and the trustees who opposed one. Additionally, a purpose was to preserve the existing scene from new Sunday commercial activity by forewarning operations which elsewhere sought Sunday commerce that if they came to the Village it would have to be on a six-day basis. Although most assuredly the intention was to close plaintiff's business on Sunday, the other provisions outlined above were not, in my view, designed to conceal a purpose to strike at plaintiff alone, but rather represented a good faith compromise of contending views, however illogical and legally inadmissible for other reasons the end result may be. Hence the ordinance cannot be struck down on the theory that it was a perversion of power aimed at plaintiff alone.
Plaintiff points out that in contiguous communities washmobiles operate on Sunday and in fact offered testimony that no other municipality in the State has closed any existing washmobile on that day. But if the Village's action is within its power and does not offend any constitutional or other limitation, the inaction of other municipalities neither curtails the Village's authority nor evidences a purpose to discriminate invidiously. Amodio v. Board of Commissioners of West New York, 133 N.J.L. 220, 225 (Sup. Ct. 1945).
Plaintiff further offered proof that prior to the adoption of the ordinance it informed the Village that Sunday closing would render its venture a financial failure, and offered testimony to establish that prognosis. Such advice to the trustees obviously does not demonstrate they had the purpose charged. Nor, in fact, does the evidence show the ordinance will have the asserted effect. The most that can be said on the basis of the proof is that plaintiff will surely experience *120 an appreciable curtailment of profits and perhaps to the point of a poor return on a substantial investment. At any rate, if the ordinance is otherwise a valid exercise of power, the financial impact upon plaintiff is an unfortunate consequence for which there is no legal remedy. The police power cannot be restrained by the exigencies of an individual entrepreneur; rather he must, if he can, adjust his business practices accordingly. Business commonly experiences the impact of new legislation designed to further the public welfare. The result may be diminished returns or even inability to compete. But the public welfare is paramount, and where the power exists, the relative value to society of the enterprise as against the desired protection raises a purely political question, the burden of which falls exclusively upon the legislative body, which, in turn, is answerable at the polls.
It should be noted that no effort is made to sustain the ordinance as to plaintiff on the theory that its operations constitute a nuisance. I am not here concerned with whether some aspects of plaintiff's conduct of its business might be reached by other exercises of police power. By the same token, plaintiff's mode of operating must, for the purpose of this case, be deemed to be thoroughly lawful, and the validity of this ordinance must be considered solely in terms of municipal power to deal with Sunday activity as such.

B.
The second prong of the attack under the equal protection provisions raises a more difficult problem. It is, of course, settled that the constitutional guarantee does not freeze any particular conception of an evil vulnerable to the police power, nor any particular mode of dealing with it. There is wide authority to classify, and if the classification is upon a reasonable basis, all that is required is uniformity within the class. The classification need not be made with mathematical nicety, nor be totally free of some inequality *121 in practice. If any set of facts reasonably can be conceived which would sustain the classification, the existence of those facts must be assumed, and the burden rests upon one who assails the classification to show that it does not rest upon any reasonable basis and is essentially arbitrary. Lindsley v. Natural Carbonic Gas Company, 220 U.S. 61, 78, 79, 31 S.Ct. 337, 55 L.Ed. 369 (1911). Additionally, it is settled that the legislative body is free to recognize degrees of harm and to hit the evil where it is felt most. Board of Health of the Township of Weehawken v. New York Central Railroad Company, 4 N.J. 293, 302 (1950); Zullo v. Board of Health of the Township of Woodbridge, 9 N.J. 431 (1952); Patsone v. Commonwealth of Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914).
The application of these principles to Sunday closing legislation has led to a variety of results in this country. It is said that "while in the majority of the older cases statutes which prohibited the following of certain occupations only, or, after general prohibitory provisions, excepted certain occupations and callings from the operation of the statute, have been sustained, the tendency of the more recent cases is to hold such statutes invalid as being discriminatory or constituting class legislation." 50 Am. Jur., Sundays and Holidays, sec. 11, p. 811. If there is such a tendency, it is not pronounced. The cases are discussed in 46 A.L.R. 290 and 119 A.L.R. 752. See also the following cases: Henderson v. Antonacci, 62 So.2d 5 (Fla. Sup. Ct. 1952); Humphrey Chevrolet, Inc. v. City of Evanston, 7 Ill.2d 402, 131 N.E.2d 70 (Sup. Ct. 1955); State v. Grabinski, 33 Wash.2d 603, 206 P.2d 1022 (Sup. Ct. 1949); McKaig v. Kansas City, 363 Mo. 1033, 256 S.W.2d 815 (Sup. Ct. 1953); People v. Friedman, 302 N.Y. 75, 96 N.E.2d 184 (Ct. App. 1950); Lane v. McFadyen, 259 Ala. 205, 66 So.2d 83 (Sup. Ct. 1953); Ex parte Hodges, 65 Okl. Cr. 69, 83 P.2d 201 (Okla. Cr. Ct. App. 1938); Gronlund v. Salt Lake City, 113 Utah 284, 194 P.2d 464 (Sup. Ct. 1948); State v. Towery, 239 N.C. 274, 79 S.E.2d 513 *122 (Sup. Ct. 1954), appeal dismissed for want of a substantial federal question, 347 U.S. 925, 74 S.Ct. 532, 98 L.Ed. 1079 (1954); State v. Penniman, 224 La. 95, 68 So.2d 770 (Sup. Ct. 1953). See Kislingbury v. Treasurer of City of Plainfield, 160 A. 654, 10 N.J. Misc. 798 (C.P. 1932).
I do not think much can be gained by a discussion of the various decisions. In the last analysis each case must turn on the particular concept of the evil to which the legislation was addressed, the classification, measured in the light of the evil, and the factual record before the court.
If the municipal police power were here unfettered by state statute dealing with the subject matter, the constitutional problem would necessarily be involved. Since, however, as concluded in IV below, the municipal power here is not thus unrestrained, but rather is curtailed by a state statute setting forth a controlling policy with respect to Sunday closing, and I find the ordinance violates that policy, and, additionally, in the light of the said policy, the ordinance is an unreasonable exercise of the delegated power, the constitutional question is not imperatively involved. Accordingly, in harmony with the view that a constitutional issue should not be considered where it is unnecessary to a decision, I ought not to express any opinion with respect to it.
The point is this: From the standpoint of constitutional limitations, the police power is not confined to the particular evil found by our Legislature, to wit, the debasement of man consequent upon interrupted labor. From the standpoint of constitutional limitations, a legislature would be free to find a different evil and to pursue a different course. For example, the purpose could be to protect from interference the peace and quiet of those who choose to rest on the Sabbath, rather than to compel them to rest. If the evil be thus conceived, obviously classifications may be made which would be inadmissible where the purpose is to compel a day of rest. The legislative body might upon that approach classify operations upon such considerations as the amount of traffic, noise, or other bustle, and weigh those *123 factors against, not necessity or charity, but rather relative utility or convenience to the public. It is not my purpose to delineate the constitutional basis of classification sustainable upon that approach, but rather to suggest the differences in results which may be reached upon different conceptions of the evil. Nor do I intimate that the classification made in the ordinance here involved could or could not be sustained if the municipality were free to find the evil to be as I have suggested. For the reasons already stated, that question should not be decided and hence is not.

IV.
Although, as stated above, the existence of a state statute does not preclude municipal legislation in this field, yet it is fundamental that a municipality, a creature of the State, may not legislate in conflict with state statutes. In fact, R.S. 40:48-2, which contains a broad grant of power to municipalities, expressly provides that the exercise be "not contrary to the laws of this state." As was said in Fred v. Mayor and Council of the Borough of Old Tappan, 10 N.J. 515, 521 (1952):
"Admittedly when the Legislature has prescribed the procedure for dealing with specific local problems, a municipality is not free to deal with those problems without regard for the legislative prescription."
Magnolia Development Co. Inc., v. Coles, 10 N.J. 223 (1952); Tagmire v. City of Atlantic City, 35 N.J. Super. 11 (App. Div. 1955); Pennsylvania Railroad Company v. Mayor and Aldermen of Jersey City, 84 N.J.L. 716 (E. & A. 1913); 5 McQuillin, Municipal Corporations (3rd ed. 1949), secs. 15.20 to 15.22, pp. 96 to 106.
This principle is, of course, equally applicable to Sunday legislation. 50 Am. Jur., Sundays and Holidays, sec. 8, p. 806; 6 McQuillin, Municipal Corporations (3rd ed. 1949), sec. 24.91, p. 772; 18 A.L.R. 738; 29 A.L.R. 397, 409; see 37 A.L.R. 575.
*124 Let us look at our state statute and compare the ordinance with it.
The statute, as revised in 1951, provides in sweeping terms the basic policy that "No worldly employment or business, except works of necessity and charity, shall be performed or practiced by any person within this state on the Christian Sabbath." N.J.S. 2A:171-1. It then excludes from its prohibition "the preparation and sale of drugs, meals, prepared food and non-alcoholic beverages," and the sale of alcoholic beverages which are subject to regulation under Title 33. N.J.S. 2A:171-2. It prohibits any person to "(a) print, publish and sell newspapers, (b) sell and deliver milk, (c) walk, ride or drive for recreation, (d) hire conveyances for riding and driving, or (e) engage or take part in any form of recreation, sport or amusement," unless a provision therefor is adopted by the voters of the municipality. N.J.S. 2A:171-6. An exhibit in the case states the voters of the Village did not adopt this provision and hence the prohibition of the state law exists.
Sections 1, 2 and 3 of the ordinance read:
"Section 1. It shall be unlawful within the limits of The Village of South Orange, on the first day of the week, commonly called Sunday, to sell or offer for sale, either at wholesale or retail, television sets, radios, phonographs, phonograph records, refrigerators, washing machines, electrical fixtures and supplies, household electrical appliances, or the component parts of any of the foregoing, or furniture, home furnishings, yard goods, toys, sporting goods, articles commonly described as notions, lumber, building materials and supplies, bedding, floor covering, hardware, garden tools, fertilizer, seeds, plants, shrubbery, cut flowers and floral arrangements, wallpaper, paints, painters' materials and supplies, wearing apparel, shoes and automobile accessories; and the selling or offering for sale thereof is hereby prohibited.
Section 2. It shall be unlawful within the limits of The Village of South Orange, on the first day of the week, commonly called Sunday, to open or keep open any place of business for the purpose of selling or offering for sale any merchandise the sale of which is prohibited on Sunday by Section 1 of this ordinance, or for the purpose of carrying on or conducting any of the following businesses, alone or in conjunction with other prohibited or permitted business or businesses; dry cleaning, laundering, tailoring, washing of automobiles, lubricating of automobiles (except the sale of motor oil), repairing of automobiles (except emergency repairs to disabled *125 vehicles), or operating a beauty shop; and the opening or keeping open of any place of business for any such purpose is hereby prohibited.
Section 3. Nothing contained in this ordinance shall be deemed or construed to prohibit, on Sunday, the preparation or sale of drugs, meals, food, baked goods, ice cream and other confections, tobacco, newspapers, non-alcoholic beverages (or alcoholic beverages which are otherwise subject to regulation under Title 33 of the Revised Statutes of New Jersey) or the delivery of flowers or floral arrangements purchased at retail prior to Sunday, nor to apply to the operation on Sunday of businesses commonly known as restaurants, luncheonettes, ice cream parlors, gasoline stations, stationery stores and news stands; provided, however, that there is not any such place of business sold or offered for sale on Sunday any merchandise the sale of which is prohibited on Sunday by Section 1 of this ordinance, and there is not carried on thereat on Sunday any of the businesses which are prohibited by Section 2 of this ordinance."
If the ordinance in so many words authorized Sunday activities prohibited by our state law, it would be invalid. Singer v. First Criminal Court of City of Newark, 79 N.J.L. 386 (Sup. Ct. 1910); Armitage v. City of Camden, 135 A. 661, 5 N.J. Misc. 129 (Sup. Ct. 1927); Geisler v. Davis, 153 A. 252, 9 N.J. Misc. 185 (Sup. Ct. 1931). Defendant urges that the ordinance does not affirmatively authorize any prohibited activities but rather proscribes certain activities equally prohibited by the statute; and in support of its claim that hence there is no conflict with the state law, cites the following cases in which ordinances prohibiting only certain limited Sunday activity were upheld. Sherman v. Mayor and Aldermen of City of Paterson, supra (82 N.J.L. 345); Fennan v. City of Atlantic City, supra (88 N.J.L. 435, affirmed 90 N.J.L. 674-677); Schachter v. Hauenstein, supra (92 N.J.L. 104); Schumacker v. Township of Little Falls, supra (92 N.J.L. 106); Mazzarelli v. City of Elizabeth, supra (11 N.J. Misc. 150); Richman v. Board of Commissioners of the City of Newark, supra (122 N.J.L. 180).
In Sherman v. Mayor and Aldermen of City of Paterson, the court found compatibility on the thesis that the municipality may have concluded the penalties of the state law *126 were inadequate to accomplish closing in the limited area and hence did not evince a purpose to select some for closing with the intent that others be permitted to operate. The court observed (82 N.J.L., at page 348) that the alleged discrimination "is more fanciful than real," since those prohibited by the ordinance are but a few of the many prohibited generally by the statute and it must be assumed that all will obey the clear mandate of the law and not violate it.
Schachter, Schumacker, Mazzarelli, and Richman follow the same approach, emphasizing that the ordinance was in aid of the state statute, and in Richman the court observed (122 N.J.L., at page 182), "Nor do we think it can be said that by making this prohibition of the sale of groceries there was any invitation given expressly or by implication that the law might be violated by the sale of other prohibited merchandise on Sunday. * * *" In Fennan the charge of discrimination rested upon a narrow basis which, for other reasons, the court found not to require consideration.
These cases were decided upon the records there made and in the light of a state law which then contained penal provisions. In the context in which the issues arose the courts concluded that the municipality in fact intended no departure from state policy. In the present case it would be more "fanciful than real" to say that the Village sought merely to implement the state policy. The ordinance itself and the testimony unmistakably show a purpose to adopt a policy distinctly different from the State's.
Defendant suggests that since this ordinance is more comprehensive in its coverage than the ordinances sustained in the cases cited above, the absence of violation of or incompatibility with state policy should be all the more evident. It seems to me that the reverse is true; that the very comprehensiveness of the ordinance suggests that the purpose was not to further the state policy but rather to adopt an approach to the subject matter different from that which the State has ordained shall be the policy within all of the municipalities of the State.
*127 It will be noted that sections 1 and 2 of the ordinance are prohibitory in phraseology. Section 3 is phrased in terms of an exclusion from the operative provisions of Sections 1 and 2, but in fact section 3 does not accomplish any exception but one, namely, the exclusion from the prior prohibition, of the delivery of cut flowers or floral arrangements purchased at retail prior to Sunday. None of the other operations specified in section 3 appear in any way to be proscribed by sections 1 or 2. Section 3 thus appears to be intended to assure the merchants and inhabitants that those Sunday operations which had theretofore operated, including those which violated the state law, would not be disturbed, and hence, in a real sense, constitutes an "invitation" to continue those activities.
Looking at the total scene, apart from the ordinance itself, we find other activities beyond those set forth in section 3 which are not restrained by the ordinance. For example, there are several manufacturing establishments in the Village. Their operations on Sunday are not reached by the ordinance. Nor does the ordinance prohibit the operation of a quarry in the Village, as to which a letter in evidence reveals the protest of the owner that, while in the past it rarely operated on Sunday, yet it would be injured competitively if its activities were prohibited while other quarries in other communities were free to operate. It does not prohibit the sale of automobiles, and the reason given is the adoption of the state law mentioned above. It does not prohibit the conduct of an existing book store, pet shop, hobby shop, camera shop, jewelry shop. In the area of services the ordinance does not prohibit existing professional operations or the use of domestic help, interior and other decorating, or the operations of building contractors. It does not prohibit the conduct of insurance business, the operation of a photographer's studio, the repair of radios and televisions, the operation of taxi cabs. The list could easily be augmented if one includes business activities not currently located in the Village but which, of course, *128 are free to go there and operate beyond the restraint of the ordinance.
The statute draws a line separating necessity and charity from other worldly occupations and businesses, and this in support of the legislative conception of the evil, to prevent physical and moral debasement of man consequent upon uninterrupted labor. This is not the policy which the trustees of the Village adopted or sought to enforce. In fact, one of the trustees who voted against the ordinance testified that it was opposed because it failed to adhere to the policy of the State just mentioned and hence was discriminatory. The process of inclusion and exclusion demonstrates that far from adhering to the state policy the trustees in fact adopted a policy based upon what had been habitual in the Village and what the trustees thought would be agreeable to the wishes of the local residents. The purpose of the trustees is well summarized in the brief filed by defendant, as follows:
"The Village Trustees in adopting an ordinance designed to prohibit many commercial activities on Sunday and preserve the residential character of the community, were entitled to take into account the pattern of life followed and accepted in the community. The Trustees determined that the articles and services enumerated in the exception provision of the ordinance were in the nature of necessities as that term is reasonably applied to the pattern of accepted activity in the Village of South Orange. Individuals might disagree as to the nature of the articles and services which should be entitled to such a characterization, but that would not impair the legality of the ordinance."
I think it perfectly clear that if the Village trustees understood that they could not adopt a policy other than one conforming to the state law, no ordinance would have been adopted. The test used was not necessity and charity versus other worldly occupations or businesses, but rather the preservation of those commercial activities, whether or not prohibited by the state statute, which the residents wished and the containment of commercial activities to those which the trustees thought were compatible with the nature and customs of the Village. For example, when one trustee was asked why Gruning's, an unusually popular shop noted *129 for ice cream and sweets but which also, to a more limited extent, serves meals, and which does a large volume of business in ice cream and sweets on Sunday, was not included with respect to at least those operations in the prohibition of the ordinance, he said that when the president of the Village inquired as to why that restraint should not be included, he asked the president whether he really wanted Gruning's closed, to which the president replied smilingly that of course he did not. The witness added that it would be unthinkable to close Gruning's because it is "an institution" in the Village. When inquiry was made as to why florists were closed on Sunday but permitted to make deliveries on that day, the explanation was, not in terms of necessity, but rather that Mother's Day and Easter Sunday are so important economically to the success of the florist that it would be unfair to prohibit at least delivery.
It is thus clear that the ordinance cannot be supported by the decisions cited above in which ordinances prohibiting some specific calling were sustained. Whereas there the prohibitions were addressed to activities which were in fact conducted on Sunday, ostensibly to assure closing by adding to the penalty of the state law, here, on the contrary, the ordinance (except for washing automobiles and the limited other restrictions described above) actually undertakes to prohibit operations which in fact had regularly been closed and hence were not violating the state law, and to exclude from prohibition, either expressly or by omission, those operations which in fact were regularly conducted on Sunday, all without reference to the terms of the state statute.
Whether in the absence of a state statute defendant could pursue the policy which it sought to establish need not be considered. It cannot do so, so long as it is the will of the State that the controlling policy in all municipalities shall be that which the state law prescribes.
It is appropriate to note the following in the dissenting opinion in State v. Fair Lawn Service Center, Inc., supra (20 N.J., at page 478):
*130 "It would appear that there are only two logical views of the problem presented: first, that the intention of the Legislature was to have the violation of the Sunday statute constitute disorderly conduct or an offense in the nature thereof and covered by the general penalty for disorderly conduct provided for in N.J.S. 2A:169-4, N.J.S.A., supra; or secondly, that the statute was to be merely declarative of the public policy of the State against Sunday activity, with penalties left to be provided for by local authorities pursuant to local ordinances."
The second alternative thus posed embodies the postulate that the role of the municipality is to buttress the state policy rather than to invoke a different policy established by a process of inclusion and exclusion. Although the reference is to the dissent, nothing in the majority opinion suggests that a municipality, if it may act, may pursue a different course.
Defendant urges that since "necessity" is not defined in the statute, the classification should be accepted as a reasonable interpretation of the word. If we look to other jurisdictions, we find interpretations of "necessity" ranging from a physical and absolute need, that is, that an acknowledged necessity of life may be sold only in those individual instances where the purchaser could not have provided for his need on a week day, to what a jury may conclude to be "work reasonably essential to the economic, social or moral welfare of the people, viewed in the light of the habits and customs of the age in which they live and of the community in which they reside." The quotation is from Francisco v. Commonwealth, 180 Va. 371, 23 S.E.2d 234 (Sup. Ct. 1942), in which it was held to be error to charge the jury that beer was not a necessity. For the variety of views, see 50 Am. Jur., Sundays and Holidays, sec. 16, p. 814.
The possibilities are obvious. It might be argued that since recreation, diversion, comfort and convenience are necessary to well-being, anything may go under the tag of necessity. But surely our cases dealing with enforcement of civil contracts and indictments for conduct of a disorderly house based upon violations of the Sunday statute do not embrace so diluted a concept. On the contrary, the statute *131 evinces a much tighter view. Thus it excludes only drugs, meals, prepared food and beverages. It permits, only upon referendum, the printing, publishing and sale of newspapers, the sale and delivery of milk, walking, riding or driving for recreation, the hiring of conveyances for riding and driving, and the participation in any form of recreation, sport or amusement. It precludes the service or execution of any writ, process, warrant, order or judgment, except in criminal cases or for breach of the peace. N.J.S. 2A:171-3.
It is unnecessary here to attempt to define necessity. It is sufficient to say that no conception of it consonant with the state statute can justify the action here taken. While of course it is true that what is a necessity in the statutory sense may well vary in specific instances, depending upon local conditions, for example, rural as against urban, yet it is equally clear that the Legislature intended the same basic test to apply throughout the State and did not intend that necessity be determined in each municipality on the basis of habits, customs or preference of the majority of the local residents.
As noted above, the revision of 1951 deleted the penalty provisions of the state law. Does that circumstance obviate the conflict between the statute and the ordinance? I think not. The statute remains a declaration of the policy of the State. It "still in mandatory terms sets Sunday apart as a day of rest." City of Elizabeth v. Windsor-Fifth Avenue, Inc., supra (31 N.J. Super., at 190). Prior to the 1951 revision, the statute repeatedly rose to bar civil remedy upon transactions in violation of it. Delaware, Lackawanna and Western Railroad Company v. Trautwein, 52 N.J.L. 169, 175 (E. & A. 1889); Illingworth v. Sloemecke, 67 N.J. Eq. 483 (Ch. 1904); Telfer v. Lambert, 79 N.J.L. 299 (Sup. Ct. 1910); Sherman v. Mayor and Aldermen of City of Paterson, supra (82 N.J.L. 345, 346); County Engineering Co. v. West, 88 N.J. Eq. 109 (Ch. 1917); Janowski v. Przebieglec, 92 N.J. Eq. 453 (E. & A. 1921); Heckel v. Burtchaell, 7 N.J. Super. 203 (App. Div. 1950); Greene v. Birkmeyer, 8 N.J. Super. 217 (App. Div. 1950). *132 Hill v. Borough of Collingswood, 9 N.J. 369 (1952), decided since the revision, assumes the continued effectiveness of the statute with respect to civil consequences. Nothing in State v. Fair Lawn Service Center, Inc., supra (20 N.J., at page 468) suggests otherwise.
Prior to the 1951 revision, it was held that a disorderly house indictment would lie on the basis of habitual violations of the Sunday statute. State v. Rosenberg, N.J., 115 A. 203 (Sup. Ct. 1915); State v. Reade, 98 N.J.L. 596 (Sup. Ct. 1923); see Rosenberg v. Arrowsmith, 82 N.J. Eq. 570, 571 (Ch. 1914). Whether such criminal liability may still be imposed in the face of the legislative determination that no penal sanction shall flow from a violation of its provisions, is too important a matter for an expression one way or the other in this case. See In re Vince, 2 N.J. 443, 451 (1949); dissenting opinion in State v. Lennon, 3 N.J. 337 (1949). If it be assumed that no criminal or penal liability attaches, the statute still remains an explicit expression of controlling policy.
Hence the deletion of the state penalty does not remove the incompatibility between the ordinance and the statute. If anything, it serves further to demonstrate it, because, whereas in the earlier cases in which limited ordinances were upheld, it could be assumed that activities not within the ordinance would continue to be closed because of the state penalty, that same assumption would now be "fanciful."
As stated above, there is additionally involved the settled rule that the exercise of powers by a municipality must be reasonable. Grogan v. DeSapio, 11 N.J. 308 (1953); Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 474 (1952); Hart v. Township of Teaneck, 135 N.J.L. 174 (E. & A 1947); N.J. Good Humor, Inc. v. Board of Commissioners of the Borough of Bradley Beach, supra (124 N.J.L., at 168); 5 McQuillin, Municipal Corporations (3rd ed. 1949), sec. 18.01 et seq., p. 382; 62 C.J.S., Municipal Corporations, § 203, p. 378.
It seems to me that an ordinance which seeks to set up a local policy inconsistent with a statewide policy declared *133 by the Legislature must be held to be unreasonable. In answering the challenge under the equal protection provisions, defendant urged that its ordinance should be deemed to be compatible with the state law on the approach that it is hitting the evil where it is felt most, and that approach is equally pertinent where the issue is whether an ordinance violates a state law or is unreasonable in the light of a state law. The conclusion hereinabove reached that the purpose was not to enforce the state policy but rather to establish a different one, is a sufficient answer. Far from hitting the evil where it was felt most, the ordinance (except for washing automobiles) in fact hit the evil where it was felt least or was totally nonexistent and omitted to hit the evil where it should have been felt most in the light of the state law.
Additionally, it may be said that the authority to hit the evil where it is felt most cannot sustain any and all classifications. That principle probably rests upon practical considerations which would frustrate the legislative process if degrees of harm could not be recognized. For example, if the subject of legislation is some aspect of the health or safety of employees, it might well be impossible for the legislative body to survey the entire area in which the particular harm may exist or to devise a formula which would be appropriate and effective in all areas of work. So also it may well be that the cost of enforcement in some areas would exceed the gain. Or certain fields of economic endeavor might be unable to bear the burden of such legislation, thus requiring an evaluation by the legislative body as to whether the benefit to society from continued operation so outweighs the quantum of harm there existing that the public welfare is better served by inaction. But I take it that if statistics should reveal that more men than women drive under the influence of liquor, or that offenders are more numerous in the age bracket of 25 to 27, the Legislature could not authorize revocation of the registration or driver's license with respect to only men in the one instance, or only persons within the age bracket 25 to 27 in the other, *134 on the thesis that it was hitting the evil where it was felt most. There would be no reasonable basis for the classification in the light of the nature of the evil. Cf. Hart v. Township of Teaneck, supra (135 N.J.L. 174); Lakewood Express Service, Inc., v. Board of Public Utility Commissioners, 1 N.J. 45 (1948); Crawford's Clothes, Inc., v. Board of Commissioners of the City of Newark, 131 N.J.L. 97 (Sup. Ct. 1944).
The fact is that the Legislature had no difficulty in dealing with the evil by a single all-embracing formula, free of differentiation on the basis of degrees of harm. I see no reason why a municipality should have any difficulty in following that approach, and I believe it is bound so to do, so long as the state law remains as it is. There is a point at which courts may not look the other way, lest basic principles become mere precatory platitudes. Washington National Insurance Company v. Board of Review, 1 N.J. 545 (1949).
The ordinance is accordingly invalid. Present judgment on notice or with consent as to form affixed.